*123 OPINION OF THE COURT
Stein, J.
This appeal requires us to clarify the circumstances in which points can be assessed to a sex offender, for purposes of determining his or her risk level pursuant to the Sex Offender Registration Act, under risk factor 7, the category addressing the offender’s relationship with the victim. Specifically, we conclude that, in the circumstances of this case, the People failed to prove that defendant established or promoted his longstanding close relationships with the child victims for the primary purpose of victimization. Because points should not have been assessed under risk factor 7, we reverse.
I.
Defendant was charged, in both Queens and Richmond Counties, with committing numerous sex offenses against four children, who were between the ages of 5 and 12 at the time of the abuse. Three of the victims were siblings, and all four of the victims were children of defendant’s childhood friends. As part of a global resolution of the charges, defendant pleaded guilty to four sex offenses in satisfaction of two Queens County superior court informations, and one sex offense in satisfaction of a Richmond County indictment. In accordance with the plea agreements, the courts imposed all of the sentences to run concurrently, for an aggregate sentence of 15 years in prison, followed by four years of postrelease supervision.
When defendant’s release date was approaching, the Board of Examiners of Sex Offenders (the Board) prepared a case summary and risk assessment instrument (RAI), as required by the Sex Offender Registration Act (see Correction Law art 6-C [SORA]), addressing the charges and convictions in both counties. The Board recommended a score of 125 points, which presumptively falls within risk level three. As relevant here, the Board did not recommend any points under risk factor 7, which the RAI entitles “Relationship with victim.” A letter submitted to the court by the Richmond County District Attorney (DA) recommended the same allocation of points as *124 recommended by the Board, similarly not including any points under risk factor 7 (see Correction Law § 168-n [3]). At a scheduling conference held a few days before the SORA hearing, Supreme Court, Richmond County clarified that defendant was contesting the Board’s assessment of points only under risk factor 6 (victim characteristics). The court also invited the parties to address risk factor 7, as well as a possible upward departure because defendant had requested a downward departure. The DA thereafter submitted a second letter, arguing that points should be assessed under risk factor 7 and, in the alternative, seeking an upward departure.
At the SORA hearing, defendant did not contest the 105 points recommended under risk factors 2 through 5. The court disagreed with the Board and the DA on risk factor 6, so it did not assess 20 points under that factor. However, the court did assess 20 points under risk factor 7, finding clear and convincing evidence that defendant had “groomed” his victims, and had changed his relationships with them to enable him to sexually abuse them. Thus, the court assessed defendant a total of 125 points, which rendered him a presumptive risk level three sex offender.[1] The court stated that, in the event it was subsequently determined that points should not have been assessed under risk factor 7 (which would then render defendant a presumptive risk level two sex offender), there was a basis for an upward departure to risk level three, due to defendant having victimized a child with a disability, who was an especially vulnerable victim.[2]
On defendant’s appeal, the Appellate Division affirmed, concluding that Supreme Court did not err in assessing points under risk factor 7 (128 AD3d 927 [2d Dept 2015]). After determining that defendant did not establish his entitlement to a downward departure, the Court had no occasion to consider *125 the People’s request for an upward departure. This Court granted defendant leave to appeal (26 NY3d 908 [2015]).
II.
One of the legislature s principal goals in enacting SORA was “to protect the public from the danger of recidivism posed by sex offenders” (People v Stevens, 91 NY2d 270, 275 [1998] [internal quotation marks omitted]). To achieve this goal, SORA contains a detailed system of registration and community notification, with each sex offender’s registration and notification obligations emanating from his or her designated risk level within a three-tiered classification scheme (see Correction Law §§ 168-h, 168-i, 168-j; People v Mingo, 12 NY3d 563, 570-571 [2009]; Stevens, 91 NY2d at 275; see also Correction Law §§ 168-p, 168-q). Under SORA, the Board must recommend a risk level for each sex offender nearing release from incarceration (see Correction Law § 168-1 [6]), based on guidelines the Board created at the legislature’s direction (see Correction Law § 168-1 [5]; Sex Offender Registration Act: Risk Assessment Guidelines and Commentary [2006] [Guidelines]).
When it drafted the Guidelines, the Board created the RAI, which is the tool used to assess points to sex offenders under various risk factors in an effort to determine their risk of re-offending and degree of danger to the community. The SORA court must hold a hearing, in which the People have the burden of proving, by clear and convincing evidence, the facts supporting the sought-after determinations (see Correction Law § 168-n [3]; Mingo, 12 NY3d at 571). The court is not bound by the Board’s recommendations but, rather, must make its own determinations based on the evidence (see People v Gillotti, 23 NY3d 841, 852 [2014]). The court is also required to set forth in writing its determinations, along with the facts and legal conclusions supporting those determinations (see Correction Law § 168-n [3]).
Only risk factor 7 is at issue here. The Guidelines provide that 20 points should be assessed under risk factor 7 if “[t]he offender’s crime (i) was directed at a stranger or a person with whom a relationship had been established or promoted for the primary purpose of victimization or (ii) arose in the context of a professional or avocational relationship between the offender and the victim and was an abuse of that relationship” (Guidelines, factor 7). Here, it is undisputed that the only relevant issue within this risk factor is whether defendant *126 promoted his relationships with the victims for the primary-purpose of victimization.
This Court has noted that “ [i] t is plain from the face of factor 7 that it is meant to focus on the relationship, or absence of a relationship, between the offender and his [or her] victim before the crime was committed” (People v Johnson, 11 NY3d 416, 420 [2008]). The Commentary to the Guidelines explains — based on cited research and the Board’s expertise “in the field of the behavior and treatment of sex offenders” (Correction Law § 168-1 [1]) — that the circumstances allowing for the assessment of points under risk factor 7 raise “a heightened concern for public safety and need for community notification” (Guidelines at 12). The Commentary emphasizes that this “is not meant to minimize the seriousness of cases where the relationship is other than that of stranger or professional — e.g., familial. The need for community notification, however, is generally greater when the offender strikes at persons who do not know him well or who have sought out his professional care” (Guidelines at 12 n 8 [emphasis added]). The Guidelines further clarify the language of risk factor 7 at issue here, and provide the following examples:
“The phrase ‘established or promoted for the primary purpose of victimization’ is adopted from the Act itself (Correction Law § 168-a[9]). An uncle who offends against his niece generally would not fall into this category. A scout leader who chooses his profession or vocation to gain access to victims and ‘grooms’ his victims before sexually abusing them would qualify” (Guidelines at 12).
Based upon the foregoing, we must determine in this case where on the spectrum to place defendant’s relationship with his victims. In his relapse prevention plan — which he was required to complete as part of his sex offender counseling and treatment program — defendant wrote that “[a] 11 four victims are the children of my childhood and family friends who I grew up with since we were adolescents]. . . . [W]e all socialized together.'I spent most of my leisure time with these families and their children.” The mother of the three sibling victims confirmed that defendant was a longtime family friend of the victims. She informed the police that, in order to give the parents some respite, defendant had been bringing her children to his home and watching them on weekends for approximately eight years, much of which time elapsed before the *127 abuse was alleged to have begun. One victim was defendant’s godson, who he had known since the child’s birth. The record further reflects that, three to six months prior to the instant offenses, defendant was forced to move from his residence and, at the recommendation of the fourth victim’s family, he rented an apartment in the same building as that victim’s grandmother and became a neighbor of that victim and his family. Defendant spent significant amounts of time at that family’s home, engaging in activities such as watching movies, playing games and eating together. Thus, as with the other victims, the record establishes defendant’s substantial nonsexual contact with the fourth victim before he began offending against that victim. Overall, defendant socialized with his four childhood friends — the parents of the victims — and their families on a daily or weekly basis for a lengthy period of time.
It is undisputed that defendant did not “establish [ ]” a relationship with these children in order to victimize them (Guidelines, factor 7). To the contrary, the record reflects that his relationships with them commenced during their infancy, due to his close and longtime friendships with their parents. The question is whether the People proved that defendant “promoted” a relationship with the children “for the primary purpose of victimization” (Guidelines, factor 7).
The word “promote” has several common definitions, including “to advance in station, rank, or honor,” and “to contribute to the growth or prosperity of” (Merriam-Webster Online Dictionary, promote [http://www.merriam-webster.com/dictionary/ promote]). However, we do not look at the word “promoted” in a vacuum; we must discern its meaning in the context of the Guidelines and the related Commentary. The Commentary references the greater need for community notification when the offender chooses victims “who do not know him [or her] well” (Guidelines at 12 n 8). The Commentary also provides contrasting examples: an uncle (who would not be assessed points under risk factor 7), and a scout leader who chooses that position to gain access to and grooms his victims before sexually abusing them (who would be assessed those points) (see Guidelines at 12).
In arguing that points should be assessed to defendant under risk factor 7, the People conflate the concepts of grooming a victim and promoting a relationship for purposes of victimiza *128 tion.[3] It is clear that points were not intended to be assessed under that risk factor based on grooming, in and of itself; instead, the assessment of those points should be determined based on the nature of the relationship in which the grooming takes place. If risk factor 7 were interpreted to require the assessment of 20 points for every offender who groomed a victim — in addition to offenders who are strangers or professionals — then the vast majority of offenders against child victims would be assessed those points. Such a blanket assessment of points is inconsistent with the purpose of the Guidelines, namely, to require enhanced community notification where abuse occurs in more distant relationships, which indicate an increased risk of reoffending.[4]
We are also unpersuaded by the People’s argument that the abuse of trust in a relationship is key to the assessment of points under risk factor 7. The Guidelines and Commentary refer to the abuse of trust only in the context of a professional relationship (see Guidelines, factor 7; Guidelines at 12). Neither the Guidelines nor the Commentary refer to the “abuse of such relationship” (Guidelines, factor 7; Guidelines at 12) with regard to the second category of offenders — i.e., those who established or promoted the relationship for the primary purpose of offending. If abuse of trust was a fundamental consideration under risk factor 7, the Guidelines would potentially require the assessment of points in almost all relationships, including familial relationships which are specifically excluded by the Commentary and by the plain language of the Guidelines (see Guidelines, factor 7; Guidelines at 12). However, we must apply the Guidelines logically, as they are *129 written, and assess points under risk factor 7 only in situations where the need for notification is enhanced (see Johnson, 11 NY3d at 418; Guidelines at 12 n 8). Indeed, we have held that, to avoid anomalous results, courts should not distort the plain meaning of the risk factors, but must assess points as required under the Guidelines; then, if the resulting risk level does not accurately reflect the offender’s danger to the community, the court may exercise its discretion by granting an upward or downward departure to vary from the presumptive risk level indicated by the risk factors (see Johnson, 11 NY3d at 418).
It is noteworthy that the Board did not assess any points against defendant under risk factor 7, and the DA did not request the assessment of such points until prompted by the court to do so. This certainly indicates that the Board interpreted its own Guidelines to mean that points were not intended to be assessed under the circumstances of this case. Given the Board’s expertise in completing RAIs (see Correction Law § 168-1 [1]), and the fact that it drafted the Guidelines at the direction of the legislature (see Correction Law § 168-1 [5]), courts should give careful consideration to the Board’s interpretations of those Guidelines (see Guidelines at l).[5]
The People bore the burden of establishing by clear and convincing evidence that defendant promoted his relationship with one or more of the victims for the primary purpose of sexually abusing them (see Correction Law § 168-n [3]; Mingo, 12 NY3d at 571). That burden was not met here. The record reflects that he had long-term, preexisting relationships with the children, continued those relationships in the role of a close family friend who regularly spent substantial amounts of time *130 with the children and their families, and did not begin to offend against them until the eldest child was approximately 11 years old (see People v Montes, 134 AD3d 1083, 1083 [2d Dept 2015], lv denied 27 NY3d 904 [2016]; see also Guidelines at 12 n 8). Therefore, the evidence in this record does not support Supreme Court’s determination that defendant “promoted” his relationships with these children for purposes of victimization (see Arthur Karger, Powers of the New York Court of Appeals §§ 13:7, 13:9 at 470-473, 479-485 [3d ed rev 2005]), as opposed to redirecting his long-standing close and involved relationships with them in such a way as to allow for sexual abuse.[6]
While we do not minimize the harm incurred by the interjection of sexual abuse into already-established close relationships, the eventual introduction of abuse into these relationships is not, alone, sufficient to assess points under risk factor 7 against an offender, such as defendant, who knew his victims well (see Montes, 134 AD3d at 1083; Guidelines at 12 n 8). If the legislature had intended for everyone who sexually offended against children to be designated risk level three, it could have imposed a mandatory override under such circumstances; it did not do so. On this record, we conclude that the lower courts erred in assessing 20 points under risk factor 7.[7] Subtracting those points results in the assessment of a total of 105 points, rendering defendant a presumptive risk level two sex offender.
We reject the People’s invitation to review Supreme Court’s alternate finding that an upward departure to risk level three *131 would be appropriate. Because the Appellate Division held that defendant was presumptively a level three sex offender, it did not consider that alternate ground (128 AD3d at 928). Accordingly, the Appellate Division order should be reversed and the case remitted to the Appellate Division for consideration of issues raised, but not determined, on the appeal to that Court.

. The court also designated defendant a sexually violent offender (see Correction Law §§ 168-a [3]; 168-d [3]), which designation is not contested.

. Supreme Court, Queens County subsequently held a SORA hearing addressing the same charges and convictions, after which it also determined that defendant was a risk level three sex offender, but on a different basis than the determination at issue on this appeal. The Appellate Division reversed the order of that court, and dismissed the Queens County proceeding, concluding that only one SORA hearing should be held for each group of “[c]urrent [o]ffense[s]” (128 AD3d 928, 931 [2d Dept 2015]). This Court granted the People leave to appeal in that case (26 NY3d 908 [2015]), which we are deciding in a separate opinion (see People v Cook, 29 NY3d 114 [2017] [decided herewith]).

. It warrants mention that the instructions for defendant to complete his relapse prevention plan, which was a requirement of his prison-run sex offender counseling and treatment program, directed him to describe “how [he] groomed the victim(s) of [his] offending behavior.” Those instructions specifically required descriptions of how he physically and psychologically groomed them, and how he groomed the social environment. To be sure, a defendant’s relapse prevention plan generally may be relied upon in a SORA proceeding. However, courts should not blindly accept every word or phrase contained therein, but should consider the context and the circumstances under which the document was created. We note the inherent unfairness here, for instance, where the State insisted that defendant embellish his relapse prevention plan with particular details of his offenses — including the implication that he must utilize the word “grooming” and characterize his actions as such — and then used those particular characterizations against him.

. Notably, at least one other risk factor is designed to explicitly take into account the particular risk of harm to child victims of sexual abuse (see Guidelines, factor 5).

. We do not suggest that the SORA court must defer to every assessment of points by the Board in reaching its ultimate risk level recommendation. The Board’s overall risk level determination is generally reached by adding the number of points assessed under each risk factor (except for situations in which an override applies or the court grants a departure). Here, for example, the Board did not assess points under risk factor 7; however, it recommended that defendant be designated a risk level three sex offender based, in part, on its assessment of points under risk factor 6. After subtracting those points — which the SORA court found were not appropriate, and which are not at issue here — the total number of points assessed by the Board would have rendered defendant a risk level two sex offender. Unlike the dissent (see dissenting op at 135 n 3), we discern nothing inappropriate or inconsistent about adhering to the Board’s interpretation of its own Guidelines, while disagreeing with the Board’s assessment of points in any particular case or under any particular risk factor.

. Contrary to the dissent’s characterization of our holding, we do not read risk factor 7 to “impose [ ] a blanket ban on [its application to] ‘preexisting’ relationships” (dissenting op at 134). Rather, our interpretation of that risk factor, and our determination that it does not apply here, are based on the nature and extent of defendant’s relationships prior to the abuse, and on the People’s failure to prove by clear and convincing evidence that such points should be assessed.

. Our reference to “the lower courts” includes Supreme Court, Richmond County and the Appellate Division, which are the two courts that rendered determinations in this proceeding. We do not rely on the SORA determination rendered by Supreme Court, Queens County in a separate proceeding, in accordance with our decision in that proceeding that the latter court should not have held a SORA hearing (see People v Cook, 29 NY3d 114 [2017] [decided herewith]). We note, however, that while the dissent approvingly refers to the Queens County SORA court’s adjudication of defendant as a risk level three sex offender (see dissenting op at 131, 135), the dissent fails to mention that such court did not assess any points under risk factor 7, found that defendant was presumptively a risk level two sex offender, and adjudicated him a risk level three sex offender only by granting an upward departure.