People v Waterbury (2024 NY Slip Op 04169)

People v Waterbury

2024 NY Slip Op 04169

Decided on August 8, 2024

Appellate Division, Third Department

Garry, P.J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:August 8, 2024

CV-23-0985

[*1]The People of the State of New York, Respondent,
v
Alexander Waterbury, Appellant.

Calendar Date:April 29, 2024

Before: Garry, P.J., Egan Jr., Clark, Lynch and Mackey, JJ.

Law Offices of Michael Pollok, PLLC, Red Hook (Michael S. Pollok of counsel), for appellant.
Emmanuel C. Nneji, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.

Garry, P.J.
Appeals from two orders of the County Court of Ulster County (Bryan E. Rounds, J.), entered June 2, 2023 and June 15, 2023, which, among other things, classified defendant as a risk level two sex offender pursuant to the Sex Offender Registration Act.
Defendant attended college in New Hampshire but left early and did not graduate as a result of grief stemming from the loss of multiple family members. He thereafter remained in New Hampshire and worked as a soccer coach at a local high school. In 2019, defendant cultivated a short-term sexual relationship with a 14-year-old student whom he was coaching; alcohol was involved. He ultimately pleaded guilty in New Hampshire to four counts of felonious sexual assault, and misdemeanor charges related to the provision of alcohol. He was sentenced to concurrent prison terms of 3½ to 7 years on three of the convictions and to a consecutive suspended sentence of 3½ to 7 years on the fourth conviction; that latter sentence was suspended for 15 years subject to defendant's compliance with various conditions (see NH Rev Stat Ann §§ 632-A:3 [II]; 651:21).
Upon his release from prison in 2022, defendant moved into his parents' home in Ulster County. Due to his convictions of offenses equivalent to rape in the second degree in this state (see Penal Law § 130.30 [1]), he was required to register in New York as a sex offender under the Sex Offender Registration Act (Correction Law art 6-C [hereinafter SORA]) (see Correction Law § 168-a [2] [a] [i]; [d] [i]). The Board of Examiners of Sex Offenders prepared a risk assessment instrument (hereinafter RAI) classifying defendant as a risk level two sex offender with a total score of 85 points, including 25 points for sexual intercourse with the victim (risk factor 2) and 20 points each for the duration of the offense (risk factor 4), the victim's age (risk factor 5) and defendant's professional relationship with the victim (risk factor 7); the People adopted that RAI. Defendant did not contest the RAI's presumptive risk level, but moved for a downward departure. The Board advised, and the People argued, against a downward modification. County Court denied defendant's request for a downward departure by order entered June 2, 2023 and subsequently issued an order classifying defendant as a risk level two sex offender. Defendant appeals from both orders.
In seeking a downward departure, "defendant was required to demonstrate, by a preponderance of the evidence, the existence of mitigating factors not adequately taken into consideration by the risk assessment guidelines" (People v Salerno, 224 AD3d 1016, 1017 [3d Dept 2024] [internal quotation marks and citations omitted]; see People v Anthony, 40 NY3d 976, 978 [2023]; People v Gillotti, 23 NY3d 841, 864 [2014]). Where an offender meets this burden of proof, "the court must then weigh the aggravating and mitigating factors to determine whether the totality of the circumstances warrants a departure to avoid an over assessment [*2]of the defendant's dangerousness and risk of sexual recidivism" (People v Anthony, 40 NY3d at 978 [internal quotation marks, brackets, ellipsis and citation omitted]). In support of a downward modification, defendant relied upon numerous circumstances that he argued reduced his risk of reoffense and were not adequately considered in the RAI, including the deterrent effect of the suspended sentence, extensive psychometric testing that placed him at low risk of reoffending, his response to sex offender treatment and the fact that the lack of consent underlying his crimes was based solely upon the age of the victim.
At the outset, we give little weight to defendant's arguments relative to the nature and consequences of the New Hampshire suspended sentence (see NH Rev Stat Ann §§ 632-A:3 [II]; 651:21). Defendant asserts that this sentencing structure was not appropriately addressed in the RAI, as this suspended sentence is distinct from postrelease supervision.[FN1] This is not compelling, in part because risk factor 14 considers the degree of supervision a sex offender is subject to following his or her release. As defendant was subject to a period of specialized supervision under the terms of the suspended sentence, he was assessed no points under that risk factor. Defendant's suspended sentence was thus considered by the RAI and is not a mitigating factor (see People v Masi, 195 AD3d 1328, 1329 [3d Dept 2021]; People v Valentine, 187 AD3d 1681, 1681-1682 [4th Dept 2020], lv denied 36 NY3d 907 [2021]; Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 17 [2006]).
Nevertheless, we find merit in defendant's argument that the positive results of multiple psychometric testing instruments and accompanying expert opinion are mitigating factors not taken into account by the RAI. The Board's commentary on its guidelines "recognizes 'that an objective instrument, no matter how well designed, will not fully capture the nuances of every case' " (People v Johnson, 11 NY3d 416, 421 [2008], quoting Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 4 [2006]). In this same vein, we are mindful that the RAI — the risk assessment instrument used by the Board for decades since SORA's enactment — has been criticized for lack of scientific validation, and it has not been updated despite significant additional scientific research in this field (see e.g. People v Romulus, 189 AD3d 553, 559 [1st Dept 2020] [Acosta, P.J., dissenting], appeal dismissed 36 NY3d 1082 [2021], lv denied 37 NY3d 910 [2021]; People v McFarland, 29 Misc 3d 1206[A], 2010 NY Slip Op 51705[U], *12-20 [Sup Ct, NY County 2010], affd 88 AD3d 547 [1st Dept 2011], lv denied 18 NY3d 860 [2011]; NY City Bar Assn on Crim Cts et al., Report on Updating the Guidelines of the Sex Offender Risk Assessment Instrument [Feb. 2022] [initially issued May 2013], available at https://www.nycbar.org/reports/updating-the-guidelines-of-the-sex-offender-risk-assessment-instrument[*3]/ [last accessed July 26, 2024]).
We recognize that additional testing "standing alone" does not necessarily establish a mitigating factor (People v Palomeque, 170 AD3d 1055, 1055 [2d Dept 2019], lv denied 33 NY3d 912 [2019]; see People v Curry, 158 AD3d 52, 60 [2d Dept 2017], lv denied 31 NY3d 905 [2018]; see also People v Rodriguez, 145 AD3d 489, 490 [1st Dept 2016], lv denied 28 NY3d 916 [2017]). Nor does the testimony of a defendant's retained expert necessarily lead to a finding of mitigation (see People v Dorvee, 203 AD3d 1413, 1415-1416 [3d Dept 2022]; People v Watson, 95 AD3d 978, 979 [2d Dept 2012]). Nonetheless, as defendant strongly urged this Court at oral argument, we should consider scientific evidence and the results of properly-validated, and broadly accepted, testing that sheds light upon an offender's risk of reoffending.
Here, defendant presented a significant body of evidence compiled by two professional evaluators. First, a licensed clinical social worker with the Ulster County Probation Department described in his report the three risk assessment tests that he administered to defendant: the STATIC-99R, STABLE-2007 and ACUTE 2007. The STATIC-99R is widely accepted by the scientific community (see People v McFarland, 2010 Slip Op 51705[U], *10 ["The most widely used (actuarial risk assessment) in the world is the 'Static 99' "]).[FN2] As described by the social worker in his report, the STATIC-99R "has moderate accuracy in ranking offenders according to their relative risk for sexual recidivism" (see generally L. Maaike Helmus et al., Static-99R: Strengths, Limitations, Predictive Accuracy Meta-Analysis, and Legal Admissibility Review, 28 Psychology, Public Policy, and Law 307, 326-327 [2022], available at https://psycnet.apa.org/fulltext/2022-61121-001.pdf [last accessed July 26, 2024]). According to the probation officer, the ACUTE 2007 measures an offender's hostility, sexual preoccupation, emotional collapse and the collapse of his or her social supports. The social worker concluded that the STABLE-2007 and ACUTE 2007 tests deemed defendant a low risk of reoffending, and the STATIC-99R test deemed him an average risk of reoffending; the combined results of the STABLE-2007 and STATIC-99R testing demonstrated that defendant was a below-average risk of reoffending, with about a 1.6% chance of doing so over a five-year period.
Defendant's retained psychologist also administered the STATIC-99 and STABLE-2007 instruments to defendant, obtaining results similar to those described by the social worker. The psychologist administered an additional battery of tests designed to reveal various sexual offense, mental health and violence risk factors. The MMPI-3 showed that defendant had "a below-average level of impulsive behavior." The PCL-R indicated that defendant had a below-average exhibition of psychopathic tendencies. A third test, the HCR-20, measuring active signs of severe mental illnesses and maladjustment, among other things, [*4]found defendant to be at a low risk of reoffending due to a dearth of historical aggression. The VRS:SO similarly assessed defendant as being in the low-risk range for recidivism based upon his lack of personal or familial history of violence and a consistent history of employment and interpersonal support. The WSFQ, a questionnaire that measures a person's sexual interests, found defendant's sexual attitudes to be normal and not supportive of violent sexual offending. The Abel Assessment for Sexual Interest-3 also delivered such results. Finally, the STAXI-2 test indicated that defendant did not have a propensity to inappropriately act on feelings of anger and could control his emotions.
Additionally, the psychologist conducted a clinical interview with defendant, examining whether he appeared to have anger issues, personality disorders or other concerning conditions, including hallucinations. This psychologist reported, based on her clinical observations, that there was no evidence defendant is sexually attracted to children, nor did defendant "appear defensive or aggressive" or have any "active psychosis, hallucinations, or delusions." In contrast, she thought he "appeared forthcoming . . . [and] legitimately remorseful" and that he was able to think normally. In sum, the psychologist found defendant to possess no acute or active risk factors related to sexual recidivism, concluding that defendant did "not pose a danger to himself or others," as he lacked substance abuse issues and a criminal history and had social, emotional and financial support.
These tests enhance the information available to the SORA court, as they review and include information beyond that incorporated in the RAI (see People v Gillotti, 23 NY3d at 861; People v Johnson, 11 NY3d at 421). To illustrate, the STATIC-99R accounts for an offender's sentencing dates in calculating an offender's criminal history, rather than using the number of convictions, as the RAI does (see People v Curry, 158 AD3d at 60; see generally People v Allen, 24 AD3d 979, 980 [3d Dept 2005]). Whether an offender has lived with a romantic partner for over two years is not considered by the RAI at all, and the record here indicates that defendant has had such relationships (see People v McFarland, 2010 NY Slip Op 51705[U], *38; Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 17-18 [2006]). Moreover, in contrast to the ACUTE 2007's methodology, the guidelines do not consider an offender's hostility or emotional issues, and they do not fully consider the degree of an individual's sexual preoccupation (see generally People v Bigelow, 175 AD3d 1443, 1444 [2d Dept 2019] [discussing " 'emotional upheaval' " as an aggravating or mitigating factor], lv denied 34 NY3d 908 [2020]; People v Bottisti, 285 AD2d 841, 842 [3d Dept 2001] [upwardly departing based on an offender's "fantas(ies) about children"]). Further, the RAI does not consider an offender's sexual interests, mental health [*5]or personality issues, or whether an offender is generally prone to violence (see generally People v Elgut, 191 AD3d 812, 813 [2d Dept 2021] [upwardly departing based on an offender's "serious mental illness"]; People v Walters, 181 AD3d 1106, 1107 [3d Dept 2020] [upwardly departing based on evidence of an offender's "attraction to children"]).
Defendant also offered evidence of unusually strong familial support, including well-documented emotional support, revealed in letters from defendant's mother, father, cousins, aunts, uncles and several others. His retained psychologist noted that defendant's family has "continued to be supportive . . . but are disappointed in him and have held him accountable for his actions." The social worker echoed this assessment in his report. As defendant asserts, the presence of this support is not fully considered or addressed within the RAI (see People v Davis, 179 AD3d 183, 189 [2d Dept 2019]; People v Tineo-Morales, 101 AD3d 839, 839-840 [2d Dept 2012]).[FN3] Defendant buttressed this argument by citing studies providing empirical evidence that family support is correlated with decreased recidivism (see Thomas J. Mowen et al., Family Matters: Moving Beyond "If" Family Support Matters to "Why" Family Support Matters during Reentry from Prison, 56 J Res Crim Delinq483, 487-489 [2019], available at https://www.ncbi.nlm.nih.gov/
pmc/articles/PMC7205225/pdf/nihms-1037209.pdf [last accessed July 26, 2024]; Rebecca L. Naser & Nancy G. La Vigne, Family Support in the Prisoner Reentry Process, 43 J Offender Rehabilitation 93, 103-104 [2006]).
"Rehabilitation on the basis of the totality of the record is [an additional] mitigating factor that is not taken into account by the [g]uidelines or the RAI" (People v Madison, 98 AD3d 573, 574 [2d Dept 2012] [citation omitted]). Although there was no demonstration that the completion of defendant's sex offender treatment was "exceptional" so as to constitute a mitigating factor not considered by the guidelines (People v Adams, 216 AD3d 1376, 1378 [3d Dept 2023] [internal quotation marks omitted], lv denied 40 NY3d 904 [2023]; see People v Green, 201 AD3d 1137, 1139-1140 [3d Dept 2022], lv denied 38 NY3d 906 [2022]), the reported observations of defendant's family, who know him well, do bear noting. In this regard, the letters from various family members reveal defendant's rehabilitation — and transformation — during his incarceration and related to his active engagement in sex offender treatment.[FN4]
The potential for rehabilitation should be recognized and considered in judicial review and imposition of SORA restrictions. As has been stated, "our application of SORA and its [g]uidelines holds the promise of the recognition of rehabilitation so as to incentivize a sex offender to achieve that which this defendant has achieved" (People v Davis, 179 AD3d at 192); this quote applies in full measure here. Through his submission of multiple psychometric test results, expert opinions and expressions [*6]of familial support, defendant has demonstrated the presence of multiple mitigating factors not considered by the guidelines. The totality of the circumstances indicate defendant poses a low risk of reoffending.Thus, in the exercise of our independent discretion, to avoid imposing lifetime and very public restrictions of a risk level two offender upon this young defendant (see Correction Law §§ 168-h [1]-[2]; 168-i; 168-l [6] [a]-[b]; 168-q [1]), we grant his motion for a downward departure and classify him as a risk level one sex offender subject to the applicable restrictions, for the requisite 20-year period (see People v Stagles, 222 AD3d 1341, 1343 [4th Dept 2023]; People v Guadalupe, 146 AD3d 442, 443 [1st Dept 2017]; People v Gonzalez, 91 AD3d 417, 417 [1st Dept 2012]; compare People v Romulus, 189 AD3d at 556; People v Goldbeck, 104 AD3d 567, 568 [1st Dept 2013], lv denied 21 NY3d 860 [2013]). Essentially, where we depart from the dissent is in our willingness to more fully consider the degree of evidence of rehabilitation and the resulting diminished potential for future criminal conduct.
In light of our determination, we need not address defendant's remaining arguments.
Clark, Lynch and Mackey, JJ., concur.
Egan Jr., J. (dissenting).
The Board of Examiners of Sex Offenders prepared a risk assessment instrument (hereinafter RAI) in this case that presumptively classified defendant as a risk level two sex offender. My colleagues feel that defendant is entitled to the downward departure to the risk level one classification that County Court declined to grant. I do not, and respectfully dissent.
At the outset, it is worth describing precisely what defendant did that led to his New Hampshire convictions and made him subject to registration under the Sex Offender Registration Act (Correction Law art 6-C [hereinafter SORA]) (see Correction Law § 168-a [2] [a] [i]; [d] [i]). Defendant was a 24-year-old soccer coach in that state when, in 2019, he was arrested following an investigation into allegations that he had a sexual relationship with a 14-year-old girl (hereinafter the victim) who was one of his players. He pleaded guilty to offenses related to his repeated sexual encounters with the victim and his plying her with alcohol during their relationship. According to the case summary accompanying the RAI, the victim stated that the two communicated via email after he had coached her on two soccer squads in 2018 and 2019, and he initially made innocuous requests like asking her to walk his dog as the summer of 2019 arrived. Before long, defendant had given the victim his Snapchat screen name and the two were communicating on that service. Defendant began inviting the victim over to his apartment, where he plied her with alcohol and told her about his improper relationship with an underage girl he had coached in another town. On July 10, 2019, the two had sex for the first time. Defendant and the victim had sex on several occasions over the [*7]next three days, and the record gives no reason to believe that defendant would not have continued the relationship but for the fact of his arrest on July 16, 2019.
Although it was that sexual relationship that led to the charges to which defendant pleaded guilty, he admitted during the investigation into his behavior that, as he had told the victim, he was also involved in a relationship of some sort with a second underage girl whom he had coached. The police interviewed the other girl, who was 13 years old, and she related how defendant made advances toward her in the summer of 2019 that were strikingly similar to the ones he had made toward the victim. The other girl added that their relationship did not bloom into a sexual relationship, but not because defendant was uninterested in one. Rather, the other girl explained that she rebuffed defendant's sexual advances and quickly left his apartment after he attempted to kiss her. The Board prepared an RAI in which it assessed 85 points against defendant, reflecting, among other things, defendant's exploitation of his professional relationship with the victim and his continued course of sexual misconduct against her. The RAI did not assess additional points for the number of victims, despite the indications that defendant had attempted to exploit a second underage girl. Even so, defendant was presumptively classified as a risk level two sex offender, and the Board did not recommend a downward departure.
With those facts in mind, the Board is comprised of five individuals who are "experts in the field of the behavior and treatment of sex offenders" (Correction Law § 168-l [1]), and it developed the RAI as a result of SORA's directive for it to "develop guidelines and procedures to assess the risk of a repeat offense by [a] sex offender and the threat posed to the public safety" that took specified risk factors into account (Correction Law § 168-l [5]; see People v Gillotti, 23 NY3d 841, 852 [2014]). The Board complied with that directive and, following consultation with "a group of experts with diverse experience in dealing with sex offenders" in the hope that the final product "would bring academic knowledge and practical acumen to the difficult task of predicting whether a person convicted of a sex crime is likely to reoffend," devised written guidelines and the implementing RAI (Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 1 [2006]). The RAI was designed to be an assessment of the risk posed by a sex offender that was "objective yet 'individualized,' 'eschew[ing] per se rules' " (People v Perez, 35 NY3d 85, 88 [2020], quoting Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 2 [2006]), which it accomplishes by assessing points for each risk factor present and using the total to make a presumptive classification of "one of three statutorily-prescribed levels of notification — levels one, two, and three in ascending order of risk — based on [*8]an offender's calculated risk to reoffend" (People v Francis, 30 NY3d 737, 743 [2018]; accord People v Perez, 35 NY3d at 88; see Correction Law § 168-l [6]).
It was that objective assessment of the risk, made using an RAI that was devised following consultation with experts in the field, that led to defendant's presumptive classification as a risk level two sex offender. The majority cites criticism of the RAI as it exists, seemingly to imply that the RAI is outdated and should be viewed with a skeptical eye when assessing the risk posed by sex offenders such as defendant. None of the members of this Court has expert knowledge on that subject, including me, and I offer no opinion as to whether the RAI and underlying guidelines should be revised. What I am confident in saying, however, is that it is the experts at the Board, and not this Court, who have the statutory responsibility to "develop [the] guidelines and procedures to assess the risk of a repeat offense" (Correction Law § 168-l [5]; see Correction Law § 168-d [3]; People v Perez, 35 NY3d at 88; People v Cook, 29 NY3d 121, 125 [2017]). The Board has not been directed by the Legislature to update the guidelines and RAI, nor has it seen a need to do so on its own initiative, and our role is not to cast doubt upon that judgment in suggesting that the RAI is somehow open to question as it exists. Our sole role is to review an order of the court tasked with assessing the risk posed by a sex offender and "determin[ing] [his or her] risk level classification by either accepting the Board's recommendation or rejecting that recommendation in favor of a different risk level classification supported by the evidence presented at the hearing" (People v Gillotti, 23 NY3d at 852; see Correction Law § 168-n [3]).
The Board here scored defendant as a presumptive risk level two sex offender. Defendant sought a downward departure, and, "[w]hile departures from the Board's recommendations are of course the exception, not the rule, the possibility of such departures has been generally recognized" (People v Johnson, 11 NY3d 416, 421 [2008]). "A court considering a downward departure from the presumptive risk level indicated by the RAI must first determine whether the mitigating circumstances alleged are of a kind or to a degree not adequately taken into account by the [guidelines], and second, whether such circumstances have been proved by a preponderance of the evidence. If the defendant meets this burden of proof, the court must then weigh the aggravating and mitigating factors to determine whether the totality of the circumstances warrants a departure to avoid an over assessment of the defendant's dangerousness and risk of sexual recidivism" (People v Anthony, 40 NY3d 976, 978 [2023] [internal quotation marks, citations, brackets and ellipsis omitted]; see People v Gillotti, 23 NY3d at 861, 864; People v Salerno, 224 AD3d 1016, 1017 [3d Dept 2024]).
Defendant attempted to meet his burden, in relevant part[*9], with the reports of a clinical supervisor at the Ulster County Probation Department and a forensic clinical psychologist who detailed how their observations and various test results led them to believe that defendant was at "a low" or "below average" risk for reoffense. "It is settled that 'merely tendering an alternative evaluation or assessment does not suffice' to meet [defendant's] burden," however, as alternative assessments do not necessarily reflect mitigating factors that were not taken into account by the RAI and underlying guidelines (People v Guilianelle, 206 AD3d 1311, 1312-1313 [3d Dept 2022], quoting People v Deming, 155 AD3d 1262, 1263 [3d Dept 2017], lv denied 30 NY3d 911 [2018]; see People v Curry, 158 AD3d 52, 60-62 [2d Dept 2017], lv denied 31 NY3d 905 [2018]). In other words, the fact that an expert or an alternative test disagrees with the presumptive risk level classification in the RAI is not enough to warrant a downward departure. Defendant must instead demonstrate that the opinion or results reflect mitigating circumstances that are, "as a matter of law, of a kind or to a degree not adequately taken into account by the guidelines" (People v Gillotti, 23 NY3d at 861).
Here, for all of the majority's extended description of the various tests that underlay the two opinions offered by defendant, it offers surprisingly little detail as to what mitigating circumstances warrant a downward departure here beyond the "submission of multiple psychometric test results, [as well as] expert opinions and expressions of familial support" (majority op at 7). With regard to the former, the mere presence of test results or expert opinions at variance with the RAI is not a mitigating factor (see People v Guilianelle, 206 AD3d at 1312-1313; People v Romulus, 189 AD3d 553, 554-555 [1st Dept 2020], appeal dismissed 36 NY3d 1082 [2021], lv denied 37 NY3d 910 [2021]; People v Curry, 158 AD3d at 59-60). As for familial support, the majority seems most impressed by the fact that family members witnessed defendant's successful engagement with sex offender treatment, but his completion of a treatment program is already taken into account by the RAI under risk factor 12 (acceptance of responsibility) and is generally not a mitigating factor. Indeed, multiple courts have determined that "defendant's strong family support network is adequately taken into account by the guidelines and thus improperly asserted as a mitigating factor" (People v Finster, 214 AD3d 1336, 1337 [4th Dept 2023], lv denied 39 NY3d 916 [2023]; see People v Gillotti, 23 NY3d at 861; People v Ack, 224 AD3d 851, 852 [2d Dept 2024]; People v Williams, 221 AD3d 567, 567 [1st Dept 2023], lv denied 41 NY3d 909 [2024]; People v Koiki, 214 AD3d 1006, 1007 [2d Dept 2023], lv denied 40 NY3d 902 [2023]). Defendant had a family support network when he committed the offenses that rendered him a sex offender to begin with, and proof of continued "support from the community or his family" does [*10]not, without more, "establish[ ] a lower likelihood of reoffense or danger to the community" that might warrant a downward departure (People v Koiki, 214 AD3d at 1007; see People v Flores-Hernandez, 219 AD3d 1533, 1534 [2d Dept 2023], lv denied 40 NY3d 910 [2024]). I am accordingly unpersuaded that defendant established the existence of any mitigating circumstances that would warrant a downward departure.
Finally, even were I to accept that defendant did show the existence of mitigating circumstances to some degree, a downward departure would still not be called for unless, "weighing the aggravating and mitigating factors[,] . . . the totality of the circumstances warrant[ed] a departure to avoid an . . . [overassessment] of [his] dangerousness and risk of sexual recidivism" (People v Gillotti, 23 NY3d at 861; see People v Anthony, 40 NY3d at 978). Defendant engaged in notably exploitative conduct by abusing his position of authority to develop a sexual relationship with the victim and, moreover, attempted to do so with a second underage girl whom he had coached. The RAI did not assess defendant additional points for his behavior toward the second girl — despite what the case summary reflects was his own admission to having a relationship with her and her statements to investigators — and I am therefore unpersuaded that the RAI overestimated his dangerousness and risk of reoffense (see Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 7, 10 [2006]). If anything, the RAI understated it. Thus, as I am satisfied that the totality of the circumstances does not warrant a downward departure, I perceive no abuse of discretion in County Court's refusal to grant one.
ORDERED that the orders are reversed, on the facts, without costs, and defendant is classified as a risk level one sex offender pursuant to the Sex Offender Registration Act.

Footnotes

Footnote 1: Defendant became subject to the conditions of his 15-year suspended sentence imposed on his fourth conviction upon sentencing — which conditions are set to expire in November 2034. In the event of his violation of the conditions of his suspended sentence, he is subject to imprisonment, the original prison sentence imposed upon the fourth conviction being 3½ to 7 years (see generally NH Rev Stat Ann § 651:21).

Footnote 2: STATIC-99 differs from STATIC-99R in that the latter is a modified version of the original test; some still use the older version of the test because they have found it more accurate in "local" testing of sex offenders (L. Maaike Helmus et al., Static-99R: Strengths, Limitations, Predictive Accuracy Meta-Analysis, and Legal Admissibility Review, 28 Psychology, Public Policy, and Law 307, 310-311 [2022], available at https://psycnet.apa.org/fulltext/2022-61121-001.pdf [last accessed July 26, 2024]). STATIC-99R changed the age item in the instrument (see People v Curry, 158 AD3d at 59 n 2).

Footnote 3: Although it has sometimes been found that family support is considered within the guidelines under risk factors 14 and 15 (see e.g. People v Dyer, 225 AD3d 1263, 1264 [4th Dept 2024]; People v Saunders, 209 AD3d 776, 778 [2d Dept 2022], lv dismissed 39 NY3d 1126 [2023]), risk factor 14 addresses whether an offender is under supervision by "a probation or parole officer" and risk factor 15 looks to whether an offender has an "inappropriate" living situation that gives him or her access to victims (Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 17-18 [2006]). Family support can thus be distinct from either risk factor, and it does not necessarily involve an offender's living arrangements.

Footnote 4: Family members further reported that, upon his release, defendant was dating a woman that he had met in college, that the couple appeared to have a good relationship, and that defendant acted appropriately and respectfully with her.