People v Shader (2024 NY Slip Op 05873)

People v Shader

2024 NY Slip Op 05873

Decided on November 26, 2024

Court of Appeals

Troutman

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 26, 2024

No. 101 

[*1]The People & c., Respondent,
v
Timothy Shader, Appellant.

Jill K. Sanders, for appellant. 
Erin N. La Valley, for respondent. 
Appellate Advocates et al., amici curiae.

TROUTMAN, J.

Defendant, previously determined to be a level three risk under the Sex Offender Registration Act ([SORA] Correction Law § 168 et seq.), commenced this proceeding pursuant to Correction Law § 168-o (2) seeking an order modifying his risk level classification. We hold that County Court did not abuse its discretion in modifying defendant's level three classification to level two but denying further modification to level one.
In 1977, defendant, age 19, entered the home of a woman to whom he was a complete stranger at approximately 3:00 a.m. After the woman attempted to defend herself by striking him in the head with a heavy object, defendant overpowered her, rendered her unconscious using an ether- or chloroform-soaked rag, and tied her up. He then raped and sodomized her. At the time of those crimes, defendant already had an escalating history of sex offenses. His first instance of sexual misbehavior occurred in 1968 when he reportedly exposed himself in school, although that incident does not appear to have led to legal proceedings. Sometime thereafter, he was adjudicated a juvenile delinquent and placed on one year of probation for conduct that, if committed by an adult, would constitute the crime of sexual abuse in the first degree (Penal Law § 130.65). Still later, in 1973, defendant forced a girl he was dating into sex, and he was charged with rape in the first degree (id. § 130.35), convicted on a reduced charge of sexual misconduct (id. § 130.20), and again placed on probation. In 1974, at around midnight, he followed two [*2]women who were leaving a bar and attempted to grab them. After one escaped, he took the other to a barn where he forced her to disrobe, took off his own clothes, lay atop her, fondled her, and stated his intent to rape her, before he was interrupted by an approaching vehicle. Defendant was adjudicated a youthful offender following a conviction of attempted rape in the first degree (id. §§ 110.00, 130.35) and sentenced to prison. He then committed his 1977 crimes one month after his release, while he was still on parole for the attempted rape. Defendant was convicted upon a jury verdict of, inter alia, rape in the first degree, sodomy in the first degree (id. former § 130.50), and burglary in the second degree (id. § 140.25), and the court sentenced him to a prison term of 8&frac13; to 30 years.
Defendant served 21 years in prison. At first, he denied responsibility for his criminal conduct and refused to participate in sex offender treatment, but he eventually took responsibility and enrolled in treatment, which he completed. Defendant was released to parole in 1998, and the sentencing court determined him to be a level three risk pursuant to SORA. The risk assessment of the Board of Examiners of Sex Offenders (Board) assessed him a total of 125 points based on the nature of his offense and his criminal history, which alone put defendant above the 110-point threshold required to classify him as a presumptive level three risk. In 2003, while still on parole, defendant was convicted of two misdemeanors: attempted auto stripping and attempted possession of burglary tools. He has no other convictions since his 1998 release.
In 2021, defendant petitioned under Correction Law § 168-o (2) to modify his risk level classification to level one. Defendant argued that he posed a low risk of reoffense based on his engagement in one-on-one outpatient sex offender treatment from 1998 to 2008; his steady full-time employment, including his current job, which he had held for 17 years; his stable and loving relationship with his wife, whom he met in 2008; his role as stepfather to his wife's daughter; and his age of 66 years. Defendant also noted that he had fully complied with his SORA obligations since his release 23 years earlier and, aside from his 2003 misdemeanor conviction, had not reoffended. He submitted letters of support from his counselor, wife, and stepdaughter. In addition, he submitted the report of an expert psychologist who examined him and concluded that his risk of reoffense was low, and that requiring him to register at risk level three was no longer necessary for purposes of public safety. At the court's request (see Correction Law § 168-o [4]), the Board submitted an "updated recommendation" stating that it "would not oppose" defendant's request for a modification to level one.
The People opposed any modification of defendant's risk level. Although the People did not challenge defendant's extensive evidence of rehabilitation, they argued that modification was inappropriate based on, inter alia, the seriousness of his crimes and his criminal record.
County Court granted the petition in part and modified defendant's risk level to level two. The court noted that the Board "did not recommend" modification to risk level one; the Board "just" "didn't oppose it." Nevertheless, considering the submissions by the Board, defendant, and the People, the court concluded that defendant proved by "clear and convincing evidence that he [wa]s less likely to reoffend than he was when he was released from prison in 1998" and classified as a level three risk. At the same time, however, the court found that defendant failed to prove by clear and convincing evidence that he was "so less likely to offend" as to warrant a modification to risk level one. Specifically, the court found that the seriousness of his 1977 crimes, wherein defendant committed a burglary of the victim's home and assaulted and raped her, outweighed the fact that defendant had not committed any sex offenses since his 1998 release. The court also considered defendant's significant history of sex offenses preceding his 1977 crimes, the commission of the 1977 crime only one month after his release to parole, and his 2003 postrelease misdemeanor conviction, also while on parole, of attempted auto stripping and attempted possession of burglary tools. Based on "all of the facts and circumstances," the court concluded that a risk level two classification was appropriate.
The Appellate Division held that there was no abuse of discretion and affirmed (217 AD3d 1040, 1041-1042 [3d Dept 2023]), and we granted defendant leave to appeal (40 NY3d 909 [2024]).
In making the initial risk level determination pursuant to SORA, the court must assess the offender's risk to the public safety in accordance with guidelines adopted by the Board that are based upon statutory factors, including the nature of the offense and any prior offenses (see Correction Law §§ 168-l [5]; 168-n [2]). Following the initial risk level determination, registered sex offenders may petition annually to modify their risk level classifications (see id. § 168-o [2]). The offender's petition must "set forth the level of notification sought, together with the reasons for seeking such determination" (id.). The legislature has assigned to the offender the burden of proving "by clear and convincing evidence" the "facts supporting the [offender's] requested modification" (id.).
On a petition for modification, as with the initial risk level determination, "the nature of a defendant's crime is a relevant, important factor to be considered by the hearing court" (People v Davis, 179 AD3d 183, 191 [2d Dept 2019]; see People v Charles, 213 AD3d 417, 417 [1st Dept 2023], lv denied 39 NY3d 915 [2023]), as is the defendant's criminal history (see People v Lewis, 211 AD3d 647, 647 [1st Dept 2022], lv denied 39 NY3d 912 [2023]). The analysis must not end there, however, because the court must "request an updated recommendation" from the Board and consider that recommendation and any other "relevant materials and evidence" submitted by the parties (Correction Law § 168-o [4]), including any evidence of rehabilitation or other changed circumstances. The court must undertake "a thorough analysis of a defendant's likelihood of reoffending and the danger the defendant poses to the community in which he or she resides" in the event of a reduced risk level classification (Davis, 179 AD3d at 191). The relevant inquiry is whether the petitioner has proved by clear and convincing evidence that " 'conditions have changed, subsequent to the initial risk level classification, so as to warrant a modification thereof' " (People v Lashway, 226 AD3d 1270, 1271 [3d Dept 2024]; see People v Clark, 207 AD3d 758, 759 [2d Dept 2022], lv denied 39 NY3d 903 [2022]; People v Bentley, 186 AD3d 1135, 1136 [4th Dept 2020], lv denied 36 NY3d 903 [2020]). "Where the hearing court's findings, expressly made under the proper evidentiary standard, are affirmed by the Appellate Division, this Court's review is limited to whether the decisions below are affected by an error of law or are otherwise not supported by the record" (People v Lashway, 25 NY3d 478, 483 [2015]).
Here, we conclude that the court did not abuse its discretion in granting defendant's petition in part and modifying his risk level classification from level three to level two but denying further modification to level one (see Charles, 213 AD3d at 417; Lewis, 211 AD3d at 647). The court properly considered the Board's and defendant's submissions, including the undisputed evidence of rehabilitation, in concluding that defendant proved by clear and convincing evidence that he was less likely to reoffend than he was at the time of his 1998 release. The court also properly considered the countervailing evidence in concluding that defendant failed to prove by clear and convincing evidence that a level one classification was appropriate. That evidence included the nature of the underlying offense, which defendant committed while on parole for a prior sex crime, defendant's prior offenses, and defendant's 2003 misdemeanor conviction of crimes committed while on parole for the underlying offense, for which he received a parole violation. Although the misdemeanors appear to have involved no violence or sexual component, we cannot conclude that the court's consideration of that factor, along with all the other factors, constitutes an abuse of discretion as a matter of law.[FN1]
Our dissenting colleagues' approach to modification proceedings would insulate that process from the primary goal of SORA, namely " 'to protect the public from the danger of recidivism posed by sex offenders, to assist the criminal justice system to identify, investigate, apprehend and prosecute sex offenders, and to comply with the Federal Crime Control Act' " (People v Boone, 41 NY3d 573, 584 [2024], quoting People v Stevens, 91 NY2d 270, 275 [1998]). Put another way, the statute aims to " 'protect[] members of the community, particularly their children, by notifying them of the presence of individuals in their midst who may present a danger' " and to " 'enhance[] law enforcement authorities' ability to investigate and prosecute future sex crimes' " (id., quoting Doe v Pataki, 120 F3d 1263, 1266 [2d Cir 1997]). These overarching goals are as relevant to a modification proceeding as they are to an initial risk level classification.
Our dissenting colleagues' interpretation of the statute would, if adopted by this Court, "expose[] the public to the risk the statute was enacted to protect against" (id. at 585) by limiting, as a matter of law, the types of convictions the SORA court could consider in determining whether to lower a defendant's risk level (see dissenting op at 4-10). The dissent's analogy to People v Brown (41 NY3d 279 [2023]) is inapt because the defendant in that case never committed an offense that was sexual in nature (see id. at 281). Here, in stark contrast, defendant committed a serious sexual assault and was responsible for a string of sex offenses, and the question is whether his more recent criminal conduct bears on the risk of his committing future sex offenses. Under the dissent's proposed rule, the SORA court would be prohibited from considering that defendant violated the law and his parole when he was caught [*3]with burglary tools after being convicted of raping a young woman during the course of a burglary also committed while defendant was on parole (see dissenting op at 4-10).[FN2] We decline to endorse that untenable result.
The dissent altogether ignores the burden of proof by speculating about the specific kinds of burglary tools that may have been in defendant's possession and the manner in which he used those tools (see dissenting op at 9). The dissent's approach is tantamount to requiring the lower courts, contrary to the clear directive of the Correction Law, to construe the record in the light most favorable to the defendant. The error is most clearly demonstrated by the dissent's own citation to Correction Law § 168-o (3), which governs petitions filed by the People for an upward modification of an offender's risk level. In those circumstances, the People must show that the defendant's risk of reoffense has increased since the initial risk-level adjudication, and the proof must establish a heightened threat to the community that the defendant will commit another sex offense. Thus, unlike the provision that governs here, section 168-o (3) assigns to the People the burden of demonstrating entitlement to such a modification by clear and convincing evidence. In short, it was not the People's burden on this defendant's petition to show that his postrelease crimes were sexually motivated.
Next, according to the dissent, the SORA court erred by relying on the prior sex offenses committed by the defendant without "engag[ing] with what has changed since" (dissenting op at 11). As detailed above, this is simply a misreading of the record. As a general matter, the dissent's approach again misapprehends the nature of the modification proceeding. The original risk level designation is presumed to apply, and the defendant has the burden of demonstrating by clear and convincing evidence that a modification of that risk level is warranted (see Correction Law § 168-o [2]). The SORA court would be remiss if it did not give weight to the serious, indeed heinous, nature of defendant's crimes. The dissent's flawed premise—that the statute guarantees to every level two and level three sex offender the ability to obtain a modification to level one—is unsupported by the statute's text and misapprehends SORA's "legislative purpose" (Brown, 41 NY3d at 281), which is to "further 'the protection of the community against people who have shown themselves capable of committing sex crimes' " (id. at 290-291). The legislature has rejected that premise by providing that certain sex offenders, like level three sex offenders, must register "for life" (Correction Law § 168-h [2]). Modification proceedings offer those defendants an opportunity to prove to a magistrate that the original assessment should no longer apply; they do not guarantee relief from this obligation.
Rather than committing the parade of errors listed by the dissent, the SORA court, under the proper framework, considered all the "relevant materials and evidence" and made an informed judgment about which risk level designation was appropriate (id. § 168-o [4]). The court's conclusion that defendant demonstrated entitlement to some relief from the more stringent requirements of a risk level three designation was an appropriate exercise of the SORA court's discretion in keeping with its statutory responsibility to protect the public.
Finally, contrary to the dissent's suggestion, appellate review of modification proceedings is robust. While the statute broadly confers upon the SORA court the discretion to grant or deny a modification petition without deference to the decision of the Board (see id.; Lashway, 25 NY3d at 483), the Appellate Division has the power to exercise its own discretion in an appropriate case and grant a defendant's petition even absent an abuse of discretion by the SORA court (see Davis, 179 AD3d at 192 [modifying risk level classification to level one on the facts and in the interest of justice]; see generally People v Z.H., 192 AD3d 55, 58 [4th Dept 2020, Troutman, J.] ["Although we do not conclude that the court abused its discretion in denying defendant youthful offender status, we choose to exercise our discretion in the interest of justice to determine that defendant is a youthful offender"]), and we review for legal error or lack of record support (see Lashway, 25 NY3d at 483). We do not blame our colleagues or the lower courts for failing to do what we might have done in the first instance (cf. dissenting op at 19 ["Mr. Shader cannot do better; we can"]).
Our decision does not preclude defendant from petitioning for a modification to risk level one based upon updated facts (see Correction Law § 168-o [2]) or for relief from his duty to register after 30 years of SORA registration (see id. § 168-o [1]).
Accordingly, the order of the Appellate Division should be affirmed, without costs.

WILSON, Chief Judge (dissenting):

In 1968, Timothy Shader, then 12 years old, exposed himself while at school. As the majority chronicles in lurid detail, between ages 12 and 21, Mr. Shader committed several sex offenses, culminating in an event forty-seven years ago, in March of 1977, when he broke into a home, raped an occupant, and was convicted of rape, burglary and other related offenses and was sentenced to 8&frac13; to 30 years in prison. He committed no sexual misconduct while incarcerated. He did not serve the maximum 30 years because the Parole Board deemed him worthy of release nine years early.
Upon his release in 1998, the Board of Examiners of Sex Offenders (the Board) recommended a level three determination pursuant to the Sex Offender Registration Act (SORA), based on 125 points assessed under the Risk Assessment Instrument (RAI), and the SORA court imposed that risk level. Since then, Mr. Shader has fully complied with the restrictions pertaining to level three; in this proceeding, he requested that his risk level be reduced to level one.
Level three "high risk" offenders are subject to SORA's most stringent mandates. They must report in person to a local police precinct to verify their addresses every 90 days (see Correction Law § 168-h). They must report any residence changes within 10 days, report their attendance at any higher education institution, provide the address of every employer they work for, and provide in writing the details of all Internet service providers, Internet screen names and email accounts (see § 168-f). They must annually report where they live by signing and returning an annual verification form to the Division of Criminal Justice Services (DCJS) within 10 days after receiving it (id.). They are pictured on the public online "sex offender registry" along with their home and work addresses, descriptions of their offense, and other identifying information, and can be validly denied jobs, housing, and education based on their status (see § 168-q [1]). Failure to perform any of these registration obligations is a felony.
There is little practical difference in the restrictions placed on level three and level two registrants. Except for the 90-day in-person reporting requirement, level two registrants are subject to the same reporting obligations. Like level three registrants, their information is also publicly available on the online registry [FN3]. In contrast, the difference between level three and level one is considerable. Perhaps most significantly, unlike levels two and three registrants, level one registrants are not pictured on the online registry, which reduces the stigma and harassment that inevitably comes with registry status and makes it more difficult for potential employers, living situations, and community groups to discriminate on that basis (members of the public may contact a hotline maintained by DCJS to obtain information about level one offenders). In addition, unlike level two and three offenders, who must register for life, level one offenders are relieved from the duty to register after 20 years.
In the 23 years between his release from prison and his application to reduce his risk level from three to one, Mr. Shader did nothing to suggest that he now poses any risk of sexual offense. To the contrary, the record of his life over that time demonstrated to the Board's satisfaction that he should be assigned a level one designation. Nevertheless, on Mr. Shader's petition to modify his risk level from three to one, the SORA court designated him a [*4]level two offender. The court gave three bases for denying Mr. Shader a level one designation: (1) Mr. Shader's 2003 misdemeanor conviction for attempted auto stripping and attempted possession of burglar tools; (2) the "seriousness" of his 1977 SORA-qualifying conviction; and (3) sexual offenses committed before the SORA-qualifying conviction, when he was between the ages of 12 and 19. The Appellate Division affirmed on the same grounds.
The essential question at a modification hearing, as at the initial SORA hearing, is whether the classification is "an accurate determination of the risk a sex offender poses to the public" (People v Mingo, 12 NY3d 563, 574 [2009]). As the majority notes, our review of those decisions is for legal error or abuse of discretion. In my view, both types of error are present here. First, the "auto stripping" misdemeanor on which both the SORA court and Appellate Division relied was legally irrelevant to the determination of Mr. Shader's present risk of sexual offending, and both courts erred in considering it. Second, in the absence of any other relevant countervailing evidence, the court abused its discretion in denying Mr. Shader's request based solely on his underlying 1977 offense and his criminal history predating his initial SORA risk level determination. By ignoring those errors, the majority neglects our duty to determine whether the lower courts' determinations may have been "affected by an error of law" (People v Lashway, 25 NY3d 478, 483 [2015]).
I.
The first error, sufficient on its own to require a reversal, is the SORA court's consideration of Mr. Shader's 2003 misdemeanor conviction in assessing his risk of sexual recidivism. The purpose of SORA is "to protect the public from the danger of recidivism posed by sex offenders" (People v Cook, 29 NY3d 121, 125 [2017], quoting People v Stevens, 91 NY2d 270, 275 [1998]). We have emphasized that SORA is designed to prevent sexual reoffending, not crime generally (People v Diaz, 32 NY3d 538 [2018]; People v Brown, 41 NY3d 279 [2023]). For that reason, SORA's risk classification scheme measures the risk of sexual reoffending, not reoffending generally, and a judge's review during modification proceedings is expressly limited to "relevant" evidence (see Corrections Law § 168-o [4] ["After reviewing the recommendation received from the board and any relevant materials and evidence submitted by the sex offender and the district attorney, the court may grant or deny the petition"]). It follows that, to be relevant at a modification proceeding, the evidence must relate to the propensity to commit a sexual offense. Mr. Shader's 2003 misdemeanor conviction for attempted auto stripping has no bearing on his propensity in 2021 to commit a sex offense.[FN4]
In 2003, while on parole, Mr. Shader received a parole violation after being convicted of attempted auto-stripping in the third degree and attempted possession of burglary tools. At the modification hearing, the People argued this conviction indicated "a lack of refraining from committing offenses." Neither the SORA court nor the Appellate Division endorsed that argument. Both courts simply stated the presence of the conviction as grounds for denying a level one without explaining the relevance to his current risk of sexual reoffense.
In context, the legislature's express use of the term "relevant" in Correction Law § 168-o means that evidence forming the basis of a SORA court's decision must relate to the propensity to commit another sexual offense (see e.g. Kuzmich v. 50 Murray St. Acquisition LLC, 34 NY3d 84, 91 [2019] ["(T)he clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself" (quoting Majewski v Broadalbin—Perth Cent. School Dist., 91 NY2d 577, 583 [1998])]). Section 168-o (3), the parallel provision that allows the People to seek an upward modification of an initial risk level determination based on [*5]subsequent events, requires that, the district attorney must show "the conduct underlying the new crime or the violation is of a nature that indicates an increased risk of a repeat sex offense" (§ 168-o [3]). Section 168-o (3) thus states the legislature's clear intent as to modification proceedings that modifications must be based only on evidence relevant to risk of a new sexual offense [FN5]. Other statutory provisions support this interpretation. For example, the section of SORA that establishes the Board specifies that the Board should develop guidelines not based on criminal history generally, but rather on "criminal history factors indicative of high risk of repeat offense," such as whether the conduct "was characterized by repetitive and compulsive behavior [or] associated with drugs or alcohol" (see § 168-l [emphasis added]).
That interpretation is also supported by our own precedent. In People v Brown, we held that a defendant could not be required to register under SORA where his crime—stealing money at gunpoint in the presence of his ten-year-old cousin—was undisputedly non-sexual in nature and the SORA court found he did not pose a sexual threat (41 NY3d 279, 281 [2023]). We emphasized that "the purpose of SORA is clearly to track those who are actual sex offenders—it is not intended as a registry of anyone who commits a crime" (id. at 297). The defendant in Brown was convicted of several violent crimes, and we nevertheless held that subjecting him to SORA lacked a rational basis, and therefore required that he not be listed on the registry at all. Mr. Shader's misdemeanor conviction pales in comparison [FN6]. The People's argument—that Mr. Shader's offense indicated "a lack of refraining from committing offenses"—would mean that any subsequent offense (jaywalking, speeding, shoplifting) may enter in the calculus of future sexual harm. That interpretation contradicts the legislature's intent.
The remoteness of Mr. Shader's 21-year-old misdemeanor also demonstrates its irrelevance. Beyond simple common sense, our precedent on witness impeachment, for example, makes clear that a defendant's prior convictions, "if remote in time, will seldom have any logical bearing on the defendant's credibility, veracity or honesty at the time of trial" (People v Sandoval, 34 NY2d 371, 377 [1974]). Likewise, the legislature's statutory scheme for enhanced punishment for repeat offenders deems prior felony convictions too stale for consideration if the sentence was imposed more than 10 years earlier (see e.g. Penal Law §§ 70.04 [1] [b]] [iv]; 70.06 [1] [b] [iv]).
The majority concedes the 2003 misdemeanor "involved no violence or sexual component" (majority op at 7). The majority nonetheless states it cannot conclude the Court's consideration of this factor "along with all the other factors" constituted an abuse of discretion as a matter of law (id. at 7, 10). The majority repeatedly implies, though [*6]does not explicitly state, that Mr. Shader's 2003 misdemeanor for attempted possession of burglary tools while attempting to strip something from a car was somehow relevant to his risk of sexual reoffense two decades later because he committed the underlying 1977 offense "during the course of a burglary" (majority op at 8). His convictions for attempted auto stripping and attempted possession of burglar's tools arose from a single incident and were therefore prosecuted jointly [FN7]. The misdemeanor was for "attempted possession," not possession; it is unclear whether Mr. Shader actually possessed anything. But even were it fair to assume that Mr. Shader possessed "burglar's tools" when attempting to strip something from an automobile, that term includes, among other things, screwdrivers,[FN8] hammers,[FN9] pliers,[FN10] tweezers,[FN11] and even plastic cards [FN12]. There is nothing in the record to suggest (and the People do not allege) that Mr. Shader was committing or had any intent to commit a burglary, much less a sex offense of any sort [FN13]. Even if we assume that Mr. Shader was apprehended in 2003 with a screwdriver in hand attempting to remove something from a car, that has no probative value as to his propensity to commit a sex offense then, much less today. SORA is about protecting against sexual reoffending; it is not a registry for hubcap theft.[FN14] Allowing the SORA court to consider a factor with no probative value to Mr. Shader's risk of sexual reoffense undermines the fundamental purpose of SORA and is (to borrow the majority's phrasing) an "untenable result" (majority op at 8).
Notably, in its recommendation to the SORA court, the Board concluded the misdemeanor convictions were "minor and are not assaultive or sexual in nature" and there was "no evidence to indicate [Mr. Shader] has engaged in any sexually inappropriate behavior in the community since his release to parole in 1998." The Board consists of persons with "expertise and experience" in the field of the behavior and treatment of sex offenders (see People v Francis, 30 NY3d 737, 747 [2018]), and it is statutorily charged to both issue recommendations and develop guidelines designed to assess "the risk of repeat offense by [] sex offender[s] and the threat posed to public safety" (§ 168-l). Because the Board has expertise in assessing the risk of sexual reoffense, the Board's conclusion that the 2003 misdemeanors were not a factor that indicated an increased risk of sexual reoffense is entitled to deference (see e.g. KSLM-Columbus Apartments, Inc. v New York State Div. of Hous. & Cmty. Renewal, 5 NY3d 303, 312 [2005]).
In sum, the modification provision restricts the Court's review to relevant materials and evidence (see § 168-o [4]). A subsequent offense need not be sexual in nature to be relevant; but it must be of a nature that it indicates an increased risk of repeat sexual offense [FN15]. Mr. Shader's 2003 misdemeanor was legally irrelevant to his propensity to commit another sexual offense, and the SORA court erred in considering it. That error falls squarely within the scope of our review.
II.
The second error is that the reliance on Mr. Shader's criminal conduct of nearly a half century ago, without more, fails to engage with what has changed since. The majority defends its result because it "does not preclude" Mr. Shader from petitioning to a level one "based upon updated facts." Again, putting aside the irrelevant misdemeanor, the only countervailing evidence to Mr. Shader's evidence of rehabilitation was the "seriousness" of his 1977 conviction and offenses prior to it. Those facts are unchangeable and will never be any less serious. The only factor that will change is time. The majority is correct that Mr. Shader could reapply and seek a modification to level one today, but it gives no explanation for why the three additional years would suddenly counteract the "seriousness" of his underlying offense or offenses prior to it. Relying on seriousness alone means denying the possibility for change, which effectively eliminates judicial review.
The Board explains in modification cases that its recommendation is based on "what has changed in the offender's life since the risk level was established." Areas the Board "weigh[s] the greatest" include successful completion of sex offender treatment; compliance with SORA and parole; time without re-offense; positive social supports; and "the overall existence of a stable, pro-social lifestyle." As the majority holds, the relevant inquiry at a modification is whether "conditions have changed, subsequent to the initial risk level classification, so as to warrant a modification thereof," (majority op at 6, quoting People v Lashway, 226 AD3d 1270, 1271 [3d Dept 2024]). I disagree with the majority's conclusion that the SORA court and Appellate Division correctly applied that standard here.
Mr. Shader presented extensive, persuasive and unimpeached evidence demonstrating that he presented no appreciable present risk of sexual reoffense. In 2021, when at age 65 Mr. Shader petitioned to modify his risk level from three to one, he had not committed a sex offense in forty-four years. Mr. Shader presented evidence that he had, during that time, done everything a person could do to comply with prison and post-release self-betterment programs and supervisory rules. While incarcerated, he engaged in therapeutic programming geared toward sex offenders, undertook vocational training and earned an Associate's degree. For the entire 10 years while on parole, [*7]he attended outpatient sex offender treatment, which included one-on-one sessions targeted to address and resolve underlying issues that led to his sex offending. He successfully completed 10 years' parole supervision and was in full compliance with his SORA registration obligations. He was steadily employed, first by Time Warner Cable as a cable installer, then by DirectTV as a satellite installer and service technician, and, for the 17 years preceding his request for modification, by One Diversified, where he works in audiovisual integration. 
His petition contained exceptionally strong letters of support. His wife of 11 years recounted how Mr. Shader cared for her after her multiple open-heart surgeries. The woman with whom he had been in a nine-year relationship prior to meeting his wife described Mr. Shader as "in a stable and loving relationship with his wife and daughter" and as having worked hard to achieve "all that he ever wanted in life, to be in a stable relationship, raise children and be a loving husband and successful provider for his family." His petition also contained a letter from his stepdaughter, who said that Mr. Shader "provided a paternal wisdom and guidance" and "provided money to cover my tuition, laptop, and travel expenses . . . [and] [a]s I took time to study in Europe, Tim remained with my mother as she again fell ill and underwent a second open heart surgery." She explained that, after coming across Mr. Shader on the online sex offender registry 12 years ago, she initially reacted with "surprise and horror," but after discussing his past with him, his openness "was a foundational factor in building a trustworthy relationship" and he "has presented his loyalty" to their family. She concluded that in the fourteen years "I have known, traveled, and lived with Tim that he has consistently provided an accepting home filled with love and the understanding that better days are always ahead." Those letters are not only valuable for their express statements concerning Mr. Shader's character and rehabilitation, but also because they evince that he has been able to maintain a strong, robust, and supportive social network since his release from prison. The People did not dispute any of those facts, and the Board credited the letters and the statements in them, concluding they not only showed Mr. Shader's character and rehabilitation, but also proved he had a "strong support network" and had been "living a prosocial life in the community without any oversight except for his SORA requirements for the past 13 years." 
Nothing in the record suggests that the SORA court applied the legal standard articulated by the majority (and the Board) and properly weighed Mr. Shader's evidence of rehabilitation [FN16]. The SORA court acknowledged that Mr. [*8]Shader has not been arrested for new sex crimes and that a psychological evaluation showed his risk was low, but did not mention the other factors "weighed the greatest" by the Board, such as compliance with SORA and parole, positive social supports, and the existence of a "pro-social" lifestyle.
The majority appears to base its conclusion that the SORA court "properly considered" Mr. Shader's submissions, including his "undisputed evidence of rehabilitation," on the fact that the court did grant Mr. Shader's petition "in part": the court downgraded Mr. Shader from a level three to a level two risk (majority op at 6). That reasoning confuses outcome with analysis. The fact that the court concluded Mr. Shader was less likely to reoffend than he was at the time of his 1998 release does nothing to ensure it properly weighed his evidence of rehabilitation, nor can it excuse flaws in the SORA court's analysis, such as the consideration of evidence irrelevant to Mr. Shader's current risk (discussed in Section I).
In contrast to the SORA court and Appellate Division, the Board examined the evidence in Mr. Shader's case in detail and concluded that "by all accounts it appears he has turned his life around and has been living a prosocial life in the community without any oversight except for his SORA requirements for the past 13 years." For that reason, the Board advised that it did not oppose Mr. Shader's request for a level one determination—meaning that the Board determined that designating him as a level one would not pose risk to the community [FN17]
. The People offered no evidence unconsidered by the Board to demonstrate Mr. Shader posed a moderate rather than low risk, and the SORA court expressed no concern with the substance of the Board's recommendation or any of the evidence it examined. The SORA court erred by discounting the Board's recommendation and, instead, relying on evidence irrelevant to determining his current risk of sexual reoffense, and the Appellate Division erred by not correcting that error. 
Mr. Shader is now 68 years old; he was 65 when he filed this petition. Between ages 21 and 65 he committed no sex offense. Instead, he married, helped to raise a child, maintained steady employment, and has strong support from not just his family, but from the woman with whom he had a prior nine-year relationship. What material improvement could he show within the past three years, or the next three? According to the People, Mr. Shader might be able to warrant a reduction to level one if he could show he had developed "serious health issues" that prevented him from being able to commit another sexual offense, directing us to People v Davis, in which the modification petitioner "had renal failure requiring five-hour hemodialysis sessions three times a week, the loss of a toe, and erectile dysfunction [and] . . . limited mobility, requiring the use of a quad cane or walker to ambulate" (179 AD3d 183, 191 [2d Dept 2019]).
Perhaps the legislature's intention in creating Section 168-o was to allow modifications to level one only when a SORA registrant was near death. It appears to me, though, from the legislative scheme and its history, that the purpose was to give registrants an incentive to overcome their past and demonstrate, by clear and convincing evidence, that they posed minimal risk of committing a sexual offense in the future. As we have recognized, SORA is "designed not to punish, but rather, to protect the public" (People v Windham, 10 NY3d 801, 802 [2008]; see Matter of North v Board of Examiners of Sex Offenders of New York, 8 NY3d 745, 752 [2007] [SORA is a statute "intending to prevent future crime," not impose punishment for a past one]; People v Gravino, 14 NY3d 546, 556 [2010] [SORA is not a penal statute, but rather, "a remedial statute intended to prevent future crime"]). The structure of SORA, including its provisions establishing the Board as experts in "the behavior and treatment" of sex offenders and requiring treatment for offenders, supports this reading (see § 168-l [emphasis added]). It would be a massive waste of resources to pay for individualized treatment if the legislature truly believed sex offenders were beyond redemption. Section 168-o (2) fits into this framework: it affirms that SORA's risk classification system is about protection, not punishment, and therefore provides a means for any registrant to modify a risk level classification by showing that no high or moderate risk presently exists. To "give meaning" to the words in Section 168-o, there must be something Mr. Shader can do, short of deliberately destroying his physical condition, to show that he no longer poses a high or moderate risk of committing a new sex offense and merits a modification from level three to level one.[FN18]
The majority makes the same mistake as the lower courts. Unable to point to any record evidence to counter Mr. Shader's evidence of rehabilitation, the majority resorts to reciting the details of Mr. Shader's 1977 offense (see majority op at 2). Those facts are not in dispute. The majority uses these facts to appall and to distract from what really is in dispute: whether someone whose conduct justified a level three designation 47 years ago can demonstrate that he now poses a low risk.
Mr. Shader cannot go back in time to change the facts of his conviction. He cannot undo the harm caused by the crimes he committed as a teenager. But his past should not eternally doom his future. Relying solely on the nature of the underlying offense and prior history—which is all in this record that pertains to sexual offending—violates the legislature's clear intent in enacting Section 168-o. Truthfully, when the sole basis for designating Mr. Shader a level two risk is the crimes that happened nearly a half century ago, continued registration is perpetual punishment, casting Mr. Shader as Sisyphus in a modern-day Tartarus.
III.
The implication of the majority's decision is that we effectively have no power to review modification decisions by SORA courts. The SORA court wrongly relied on evidence without "any conceivable sexual component," disregarded the Board's expertise, and discounted Mr. Shader's "undisputed evidence of rehabilitation." The only relevant countervailing evidence had no bearing on the changes Mr. Shader worked hard to show over the 45 years before he sought a modification and was already considered in determining his initial risk level. The majority nonetheless holds we cannot conclude the SORA court abused its discretion. There is nothing "robust" about that kind of review. If these errors are not sufficient, it is unclear what errors might be. Mr. Shader cannot do better; we can.
Order affirmed, without costs. Opinion by Judge Troutman. Judges Garcia, Singas and Cannataro concur. Chief Judge Wilson dissents in an opinion, in which Judges Rivera and Halligan concur.
Decided November 26, 2024

Footnotes

Footnote 1: Defendant acknowledged his crimes committed while on parole for the instant offense and never argued that the court could not consider those crimes as a matter of law, as the dissent now suggests. Rather, as the dissent demonstrates (see dissenting op 5 n 2), defendant argued that he would most appropriately be classified at level one because his most recent evidence of rehabilitation outweighed the severity of his history of sex offenses and postrelease criminal conduct.

Footnote 2: Our decision does not turn on the facts underlying the postrelease conviction and parole violation. We highlight these details only to illustrate the folly of the dissent's approach by reference to the facts of this case.

Footnote 3: There are other relatively minor differences: for example, level two offenders must report in person for current photograph every three years, while level three offenders must appear every year (see § 168-f [2]).

Footnote 4: The majority implies that this argument is not preserved because Mr. Shader "never argued in his petition that [the 2003 misdemeanor] could not be considered as a matter of law" but instead "argued that he would most appropriately be classified at level one because his most recent evidence of rehabilitation outweighed the severity of his history of sex offenses and postrelease criminal conduct" (majority op at 7, n 1). In disputing the People's contention that the attempted auto stripping conviction was relevant to Mr. Shader's modification petition, Mr. Shader argued to the SORA court that it was "not an assaultive incident. It's a minor misdemeanor conviction." The SORA court relied on that misdemeanor in making its determination. Either of those is sufficient to preserve the issue for our review (see CPLR 4017, 5501[a][3]). (In contrast to this clearly preserved argument, the majority resorts to an argument that neither a party nor court ever raised [see infra at 10, n 14]). 

Footnote 5: The majority misconstrues my reliance on § 168-o (3). The provisions governing upward and downward modifications are parallel provisions: they concern the same legal question of whether a change in risk level is warranted (or, in another framing, what is the registrant's current risk of sexual re-offense). Section 168-o (4)'s directive applies to both proceedings. The majority's approach is textually unfounded and would lead to the absurd result that crimes with no relevance to sexual risk—that the legislature prohibited the People from using on upward modifications to prove a registrant poses a higher risk—could validly be used by the People on downward modifications to counter a registrant's evidence that he poses a lower risk (see e.g. Lubonty v US Bank Nat'l Ass'n, 34 NY3d 250, 255 [2019] ["We must . . . 'interpret a statute so as to avoid an unreasonable or absurd application of the law'"] [quoting People v Garson, 6 NY3d 604, 614 (2006)]).

Footnote 6: The majority's contention that Brown is irrelevant because the defendant in Brown never committed a sexual offense misses the point (see majority op at 8). The defendant in Brown committed a serious, violent offense, but was nonetheless found to pose no sexual threat, and we held he could not be forced to register under SORA as a result. This holding has two implications. First, it shows that the purpose of SORA is to protect against the risk of sexual reoffending, not reoffending generally. Second, it disproves the SORA court's (and majority's) contention that any criminal conduct is relevant to someone's likelihood to commit a future sexual offense. The underlying offense in Brown had no nexus to sexual offending and the defendant was found to pose no sexual threat. This shows that not all criminal conduct is relevant to SORA determinations; rather, the conduct must be of such a nature that it indicates an increased risk of sexual offense (see § 168-o [3]). This is no less true here than it was in Brown: that someone has previously committed a sexual offense does not suddenly make all their subsequent conduct relevant to their risk of future sexual reoffense.

Footnote 7: At the modification hearing, counsel explained that Mr. Shader recalled being caught "attempting to take something off of a[n] . . . abandoned car."

Footnote 8: People v Smith, 23 NY2d 955 (1969).

Footnote 9: People v Oddo, 19 NY2d 979 (1967).

Footnote 10: People v Allen, 278 AD2d 331 (2d Dept 2000).

Footnote 11: People v Davis, 155 AD2d 611 (2d Dept 1989).

Footnote 12: People v Luperena, 159 AD2d 727 (2d Dept 1990).

Footnote 13: The complete lack of record evidence on the factual circumstances of this offense defeats the majority's claim that I am "constru[ing] the record in the light most favorable to the defendant" (majority op at 9). I am merely pointing out that there is nothing in the record to construe, and thus no basis for the majority's claim that the misdemeanor "bears on his risk of committing future sex offenses" (majority op at 8).

Footnote 14: The majority's attempt to establish the relevance of the 2003 conviction for attempted possession of burglar's tools to Mr. Shader's 1977 conviction for rape in the course of a burglary by observing that both involved statutes having the word "burglar" in them was not advanced by the People in the SORA court, the Appellate Division or here. The lower courts merely referred to the 2003 misdemeanor convictions as grounds for denying Mr. Shader's request for a level one designation. Likewise, the People have not contended the burglar's tools have any particular relevance, but instead contend that the 2003 misdemeanor convictions are relevant because they show Mr. Shader's broader "willing[ness] . . . to reoffend." Interested lawyers should note the majority's approval of resort to an argument that neither a party nor court ever raised—it might come in handy the next time a preservation question arises.

Footnote 15: When the majority claims that approach might "limit . . . the types of convictions" SORA courts may consider (majority op at 8), that is exactly the point: convictions that have no bearing on risk of sexual reoffense—like any other fact that has no bearing on risk of sexual reoffense—have no place in a SORA risk level determination, whether when setting the original risk level or setting the level on a motion for modification. That is the very definition of relevant evidence. Some crimes with no sexual component may bear on risk of sexual reoffense, but the facts here, involving attempted auto stripping 20 years earlier, do not.

Footnote 16: Indeed, the order issued by the SORA court in this case was not an order under section 168-o, which concerns modification requests, but rather a "rating order pursuant to Correction Law 168-d," which concerns requests for downward departures in the context of an initial SORA risk level determination. The order is not merely titled erroneously, but three times within the text of the order relies on that section, never once references the proper statutory section, and ultimately recites: "The above Final Risk Level Determination is a Downward departure based upon mitigating or aggravating factors shown by clear and convincing evidence allowing for such departure"—all of which pertains not to risk-level modification proceedings, but to the initial SORA hearing (see § 168-d).

Footnote 17:As a way of discrediting the Board's recommendation, the majority quotes the SORA court's statement that the Board "'did not recommend' modification to level one'; the Board 'just didn't oppose it'" (majority op at 4). There is no difference between the two. Section 168-o (4) requires the Board to provide an "updated recommendation" of the defendant's risk level in every modification proceeding, and the Board's choice not to oppose a given level is its risk level recommendation (see 168-o [4] [emphasis added]). The Board's use of the "would not oppose" language is a purely semantic choice that it employs in its recommendations in modification proceedings (see e.g. People v Smilowitz, 178 AD3d 1187 [3d Dept 2019] [Board was "'not opposed to a downward modification' of defendant's risk level classification to a risk level one"]; People v Davis, 179 AD3d 183 [2d Dept 2019] [Board "did not oppose" a reduction to level two but opposed a reduction to level one]).

Footnote 18: The majority disputes my "flawed premise" that SORA "guarantees every level two and level three sex offender the ability to obtain a modification to a level one" (majority op at 10). But it is the majority's reading that is flawed: It is unclear how else to interpret § 168-o(2)'s plain text that "[a]ny sex offender required to register" under SORA may petition for an order modifying the level of notification, other than to guarantee any sex offender required to register under SORA the ability to petition for an order modifying their level of notification (§ 168-o[2] [emphasis added]). The statute does not guarantee that every registrant will succeed in obtaining a level one designation, but it does guarantee every registrant the opportunity. (Perhaps the majority believes certain level two and three offenders, given the "serious, indeed heinous" nature of their crimes [majority op at 9], should not be entitled to the ability to obtain a level one, but that is a matter to be brought
up with the legislature). As support for its contention, the majority observes that the legislature has provided "certain sex offenders, like level three offenders, must register 'for life'" (majority op at 10 [quoting § 168-h(2)]). That observation is neither here nor there. Level three registrants can petition to level one, and, if successful, are no longer required to register for life. Perhaps the majority means to refer to the statute's provisions on designations. It is true that a registrant with a designation is statutorily required to register for life, even as a level one (see § 168-h[2]). However, even a registrant with a designation can petition to modify to level one and obtain other benefits of level one status, such as removal from the public online registry. There is no indication in § 168-o(2) that the legislature meant to exclude these registrants (or indeed, any registrants) from the ability to obtain a risk level modification.